JRS/ALK/KRA
F. #2020R00146

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

EDENILSON VELASQUEZ LARIN,
    also known as "Agresor,"
    "Saturno," "Tiny," "Erick" and "Paco,"
HUGO DIAZ AMAYA,
    also known as "21" and "Splinter,"
JOSE AREVALO IRAHETA,            Docket No. 20-CR-228 (S-3) (LDH)
    also known as "Splinter," "Inesperado"
    and "Daniel,"
JOSE ESPINOZA SANCHEZ,
    also known as "Cable," "Bleca," "Clave,"
    "Fantasma" and "Victor," and
JOSE GUEVARA AGUILAR,
    also known as "Tranquilo," "Malhechor"
    and "Angel,"

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## THE GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR AN ANONYMOUS AND PARTIALLY SEQUESTERED JURY

JOHN J. DURHAM
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Jonathan Siegel
Anna L. Karamigios
Kamil R. Ammari
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND............................................................................................................... 1

    I.     La Mara Salvatrucha ......................................................................................... 1

    II.    The Defendants .................................................................................................. 2

    III.   The Murder of Kenny Reyes............................................................................. 3

    IV.   The Murder of Victor Alvarenga....................................................................... 3

    V.    The Murder of Abel Mosso .............................................................................. 4

    VI.   The Conspiracy to Murder 18th Street Gang Members and the Attempted Murder of John Doe 5 ....................................................................................... 5

    VII.  The Murder of Eric Monge............................................................................... 6

    VIII. The Conspiracy to Murder John Does 7 and 8, and the Attempted Murder of John Doe 7 ........................................................................................................ 7

    IX.   The Attempted Murder of John Doe 9............................................................... 8

    X.    The Murder of Oswaldo Gutierrez Medrano ..................................................... 8

    XI.   Additional Crimes ............................................................................................. 9

ARGUMENT.................................................................................................................... 9

    I.     Legal Standards................................................................................................. 9

        A.   Dangerousness.......................................................................................... 11

        B.   Past Attempts and Present Ability to Interfere with the Judicial Process........ 12

        C.   Publicity................................................................................................... 13

    II.    There Is Strong Reason to Believe that the Jury Needs Protection in this Case ... 13

        A.   The Defendants Are Dangerous .................................................................. 14

        B.   The Defendants and their Associates Have Evinced a Clear Intent and Ability to Interfere with the Judicial Process ................................................. 15

C.      The Anticipated Media Coverage Will Expose the Jurors to Pressure............20

III.    An Anonymous Jury Will Not Prejudice the Defendants...................................20

A.      An Anonymous Jury Will Not Hinder the Defendants' Ability to Make Informed Choices During Jury Selection ........................................................21

B.      The Court Can Explain the Reasons for Anonymity to Prospective Jurors in Neutral Terms That Will Eliminate the Risk of Prejudice to the Defendants.........................................................................................................22

CONCLUSION................................................................................................................24

## TABLE OF AUTHORITIES

### Cases

Georgia v. McCollum,
   505 U.S. 42 (1992) ........................................................................................................... 22

United States v. Amuso,
   21 F.3d 1251 (2d Cir. 1994)...................................................................................... 10, 21

United States v. Ashburn,
   No. 13-CR-0303 (NGG), 2014 WL 5800280 (E.D.N.Y. Nov. 7, 2014) ................... 11, 13, 19

United States v. Aulicino,
   44 F.3d 1102 (2d Cir. 1995)...................................................................................... 10, 12

United States v. Barnes,
   604 F.2d 121 (2d Cir. 1979)................................................................................. 10, 12, 21

United States v. Bellomo,
   263 F. Supp. 2d 557 (E.D.N.Y. 2003)............................................................................. 21

United States v. Brown,
   No. 20-CR-293 (WFK), 2022 WL 4586302 (E.D.N.Y. Sept. 29, 2022)................... 11, 22, 23

United States v. Cacace,
   321 F. Supp. 2d 532 (E.D.N.Y. 2004)............................................................................. 11

United States v. Gotti,
   459 F.3d 296 (2d Cir. 2006)...................................................................................... 10, 11

United States v. Ibrahim,
   529 F. App'x 59 (2d Cir. 2013) ...................................................................................... 10

United States v. Kadir,
   718 F.3d 115 (2d Cir. 2013)............................................................................................ 10

United States v. Kaziu,
   559 F. App'x 32 (2d Cir. 2014) ...................................................................................... 10

United States v. Locascio,
   6 F.3d 924 (2d Cir. 1993)................................................................................................ 10

United States v. Mayes,
   No. 12-CR-385 (ARR), 2013 WL 6175824 (E.D.N.Y. Nov. 25, 2013) ......................... 13, 19

United States v. Napout,
   963 F.3d 163 (2d Cir. 2020)............................................................................................ 10

United States v. Paccione,
    949 F.2d 1183 (2d Cir. 1991) ...................................................................... 10, 11, 12, 13, 21

United States v. Persico,
    832 F.2d 705 (2d Cir. 1987) ...................................................................................... 10, 21

United States v. Pica,
    692 F.3d 79 (2d Cir. 2012) .............................................................................................. 10

United States v. Prado,
    634 F. App'x 323 (2d Cir. 2016) ..................................................................................... 10

United States v. Quinones,
    511 F.3d 289 (2d Cir. 2007) ..................................................................................... 10, 13

United States v. Scarfo,
    850 F.2d 1015 (3d Cir. 1988) ......................................................................................... 23

United States v. Silva,
    715 F.2d 43 (2d Cir. 1983) ............................................................................................. 21

United States v. Suarez,
    No. 16-CR-403 (JFB), 2020 WL 7699663 (E.D.N.Y. Dec. 28, 2020) ........... 12, 16, 19, 22, 23

United States v. Thai,
    29 F.3d 785 (2d Cir. 1994) ....................................................................................... 10, 21

United States v. Thomas,
    757 F.2d 1359 (2d Cir. 1985) ............................................................................ 10, 12, 21, 23

United States v. Tutino,
    883 F.2d 1125 (2d Cir. 1989) ................................................................................ 10, 11, 21

United States v. Vario,
    943 F.2d 236 (2d Cir. 1991) .................................................................... 10, 11, 12, 13, 21

United States v. Wilson,
    493 F. Supp. 2d 397 (E.D.N.Y. 2006) ...................................................................... 11, 13

United States v. Wong,
    40 F.3d 1347 (2d Cir. 1994) ........................................................................................... 10

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motion for an anonymous and partially sequestered jury in the October 14, 2025, trial of defendants Edenilson Velasquez Larin, Jose Arevalo Iraheta, Jose Espinoza Sanchez, Jose Guevara Aguilar, and Hugo Diaz Amaya.  Specifically, the government requests that: (1) the identities of all prospective jurors, including their names, addresses and places of employment, not be revealed to any party or their attorneys; and (2) from the time each juror is empaneled until the conclusion of the trial, the jurors eat lunch together and be accompanied in and out of the courthouse by members of the United States Marshals Service each day so that they do not mingle in the courthouse with the public or any potential trial spectator.

As explained below, these measures are necessary due to, among other things, (1) the nature of the charged offenses, which include multiple murders in aid of racketeering; (2) the defendants' affiliation and leadership roles within La Mara Salvatrucha, also known as MS-13, a violent, transnational criminal organization that has engaged in a pattern of obstruction of justice, including witness tampering and witness retaliation, over the past decade; and (3) the fact that this case has been the subject of media coverage, which is likely to increase leading up to and during trial.  In short, an anonymous and partially sequestered jury is necessary to assure the public's right to a fair trial by protecting the jury from improper influence or intimidation. Moreover, these precautions will not deprive the defendants of meaningful jury selection, diminish the presumption of innocence, or cause any prejudice.

BACKGROUND

I.    La Mara Salvatrucha

At trial, the evidence will establish that all five defendants were members of MS-13.  The gang is divided into local chapters or "cliques" that operate in Queens and Long Island,

New York, and elsewhere.  Members of MS-13 routinely engage in acts of violence against members and perceived members of rival gangs.  In particular, and as detailed below, MS-13 has engaged in street wars against the 18th Street gang and the Latin Kings gang.  Those wars have resulted in the murder, shooting, and assault of gang members on both sides, as well as individuals with no gang affiliation and innocent bystanders.

In addition to targeting rival gang members, MS-13 members have committed violent attacks, including murders, against individuals whom they believe (often incorrectly) to be cooperating with law enforcement, as well as MS-13 members who otherwise violate the gang's rules or leave the gang.  Indeed, as detailed further below, numerous MS-13 members have been convicted in this District of murdering individuals who they believed were cooperating with law enforcement.

Notably, the evidence will also establish that two of the defendants were national leaders of MS-13.  Since approximately 2021, virtually all MS-13 cliques in the United States have been united under a single hierarchy known as the "U.S. Program."  The U.S. Program is led by a group of senior gang leaders, known as "La Mesa" ("The Table" in English), most of whom are incarcerated.  La Mesa, among other roles, authorizes and directs murders throughout the country, including in New York.  Velasquez Larin and Diaz Amaya were two of the few members of La Mesa outside of prison and were among the top leaders responsible for the gang's operations on the East Coast of the United States.

II.    The Defendants

Four of the defendants were members of the Fulton Locos Salvatruchas clique of MS-13 ("FLS").  At the time of his arrest, Velasquez Larin was a leader of the FLS clique and one of the leaders of the U.S. Program.  Espinoza Sanchez had a leadership role within the FLS clique underneath Velasquez Larin.  Arevalo Iraheta and Guevara Aguilar were also members of

the FLS clique. The remaining defendant, Diaz Amaya, was a leader of the Park View Locos Salvatruchas clique of MS-13 ("PVLS") and, along with Velasquez Larin, was one of the leaders of the U.S. Program.

### III.   The Murder of Kenny Reyes

On or about May 23, 2016, Velasquez Larin, Espinoza Sanchez, and two members of the Hempstead Locos Salvatruchas clique of MS-13 murdered Kenny Reyes, an 18-year-old living in Nassau County. The MS-13 members believed that Reyes was a member of the rival 18th Street gang and hoped to move up in rank in MS-13 by killing Reyes. The men lured Reyes to a wooded area, where they struck Reyes with machetes, killing him, and buried Reyes's body in a nearby hole. For years after the murder, Velasquez Larin and Espinoza Sanchez bragged about their roles in the killing to other MS-13 members, and both were promoted within the gang as a result of the killing.

### IV.   The Murder of Victor Alvarenga

In 2018, Victor Alvarenga and other individuals began hanging out in Flushing, Queens, and telling people that Alvarenga was a homeboy, i.e., a full-fledged member, in the Hollywood Locos Salvatruchas clique of MS-13. At some point, Alvarenga met Espinoza Sanchez and disrespected him. Espinoza Sanchez and Velasquez Larin began to call MS-13 members in El Salvador to look into Alvarenga and his history with the gang. They ultimately were told by leaders in El Salvador that Alvarenga had cooperated with the police in El Salvador and as a result was "green lit," meaning that he was marked for death by the gang. Velasquez Larin and Espinoza Sanchez instructed members of the FLS in Queens to befriend and surveil Alvarenga, which they did.

Around the same time, Alvarenga had a dispute with Ramiro Gutierrez and Tito Martinez-Alvarenga, two members of the Indios Locos Salvatruchas clique of MS-13 ("ILS").

Eventually, Espinoza Sanchez informed ILS that Alvarenga had cooperated with the police in El Salvador, and the two cliques decided to work together to kill Alvarenga.

On the night of November 3, 2018, Gutierrez, Martinez-Alvarenga, Espinoza Sanchez and two FLS members — Jairo Martinez-Garcia and Douglas Melgar-Suriano — met to kill Alvarenga.[1]  They stalked him for hours, waiting for him to leave a bar where he was hanging out.  Melgar-Suriano, Martinez-Garcia, and Martinez-Alvarenga eventually encountered Alvarenga outside his home.  They walked with him for a few blocks, and then Melgar-Suriano and Martinez-Garcia shot him in the head.  While Alvarenga lay dying in the street, Martinez-Alvarenga took Alvarenga's phone out of his pocket to prevent discovery of communications between Alvarenga and Martinez-Alvarenga that night.  The three men then fled to a waiting getaway car, driven by Gutierrez, who was accompanied by Espinoza Sanchez.

V.    The Murder of Abel Mosso[2]

In approximately early 2019, Martinez-Alvarenga learned of a member of the 18th Street gang from a drug dealer he knew who sold drugs in Flushing, Queens.  The drug dealer sent a photograph of the 18th Street member, Abel Mosso, to Martinez-Alvarenga, and agreed to tell Martinez-Alvarenga when Mosso would be coming to buy drugs.  Martinez-Alvarenga, Gutierrez, Victor Lopez, Ismael Santos-Novoa, and low-level ILS member Emerson

---

[1]    Martinez-Garcia and Melgar-Suriano have pleaded guilty to the murder of Alvarenga.  Gutierrez and Martinez-Alvarenga have allocuted to murdering Alvarenga as part of their guilty pleas to racketeering conspiracy.

[2]    Although none of the defendants in the October 2025 trial are charged with the murder of Mosso, the government intends to admit evidence of the murder at trial to prove the existence and nature of the charged enterprise.  In addition, as set forth herein, the government will offer proof that Espinoza Sanchez provided the firearm used in the murder.

Martinez-Lara all agreed that they would kill Mosso.[3]  The group further agreed that Lopez would be the one to shoot Mosso so that Lopez could go up in rank.

On the day of the murder, February 3, 2019, Gutierrez, Martinez-Alvarenga, and Lopez followed Mosso onto the 7 train, while Santos-Novoa and Martinez-Lara went to nearby train stations to serve as lookouts for the police.  Lopez was armed with a firearm that had been provided to ILS by members of FLS, at the direction of Espinoza Sanchez.  At some point, Mosso spotted Lopez and began to fight him before Lopez could pull out the gun.  Mosso fought Gutierrez, Martinez-Alvarenga, and Lopez on the train, and the fight eventually spilled onto the platform.  The men struggled over the gun, and one of the three MS-13 members yelled out to the crowd of onlookers to not get involved because they were "La Mara Salvatrucha," i.e., MS-13.  Eventually, Gutierrez gained control of the gun.  Mosso pleaded for help from the crowd, and then Gutierrez shot him repeatedly in the head.

One onlooker on the platform recorded the murder on his phone, including video of Gutierrez shooting Mosso.  This video was subsequently posted on social media, where it spread widely and was included in numerous news broadcasts about the incident.

## VI.    The Conspiracy to Murder 18th Street Gang Members and the Attempted Murder of John Doe 5

Beginning in or about late 2019, Espinoza Sanchez learned that members of the rival 18th Street gang were increasing their presence in FLS's territory in Elmont, New York.  Velasquez Larin and Espinoza Sanchez directed MS-13 members to patrol the Elmont territory in search of 18th Street members to kill.  In spring 2020, Velasquez Larin also arranged for MS-13 members from Maryland to travel to New York to patrol the Elmont territory alongside MS-

---

[3]    Martinez-Lara and Lopez have pleaded guilty to the murder of Mosso, and Gutierrez, Lopez, Martinez-Alvarenga, and Santos-Novoa have allocuted to their participation in the murder of Mosso as part of their guilty pleas to racketeering conspiracy.

13 members from New York.  Arevalo Iraheta and Guevara Aguilar, among other FLS members, participated in patrolling Elmont in search of 18th Street members or otherwise assisted in the conspiracy.

On May 3, 2020, Arevalo Iraheta, an MS-13 member from Maryland, and others were conducting surveillance to find an 18th Street member to kill.  The group ultimately saw an individual — John Doe 5 — wearing a red shirt.  Arevalo Iraheta and the MS-13 member from Maryland confronted John Doe 5 and shot at him several times, but missed, and then fled.

VII.    The Murder of Eric Monge

In or about 2020, FLS member Oscar Hernandez Baires had a personal dispute with Eric Monge, then a member of the Guanacos Little Cycos Salvatruchas clique of MS-13, which resulted in Monge punching Hernandez Baires.  As the dispute escalated, Hernandez Baires notified Espinoza Sanchez, who in turn informed Velasquez Larin.  Velasquez Larin gave the order to kill Monge.

Approximately one month before the murder, Velasquez Larin, Espinoza Sanchez, Guevara Aguilar, and Hernandez Baires drove to a park in Hempstead, where they discussed the order to kill Monge.  Velasquez Larin provided Guevara Aguilar and Hernandez Baires with guns and instructed them to surveil the area around Monge's home.  Members of the gang — including Velasquez Larin, Espinoza Sanchez, Guevara Aguilar, and Hernandez Baires — later conducted surveillance and searched for Monge on various occasions.

In the early morning hours of September 6, 2020, Guevara Aguilar and Hernandez Baires shot and killed Monge while he was seated in the front passenger seat of his parked car near his home in Queens.[4]  Monge's wife had just returned to the car after bringing their young children

---

[4]        Hernandez Baires has pleaded guilty to the murder of Monge.

inside their residence when Hernandez Baires and Guevara Aguilar began shooting. After the shooting, Guevara Aguilar and Hernandez Baires ran back to a car where Arevalo Iraheta and FLS member Erick Zavala Hernandez were waiting to help them escape. As they fled to the car, Guevara Aguilar dropped his hat, which was later found to have his DNA on it.

VIII.    The Conspiracy to Murder John Does 7 and 8, and the Attempted Murder of John Doe 7

On the evening of July 29, 2021, FLS members Christian Alas Leon and Jose Perez Ovando were hanging out at a tobacco shop in Westbury, New York, with a third FLS member, when a member of the rival Latin Kings gang entered. Alas Leon and the Latin Kings member — John Doe 6 — began to fight with their fists. Alas Leon, Perez Ovando, and the third FLS member then chased John Doe 6 in the street while brandishing machetes, and the FLS members slashed John Doe 6 several times in the back and head before he managed to escape.[5]

As retaliation for the above-described machete attack on July 29, 2021, later that same night, a Latin Kings member — John Doe 8 — stabbed an FLS member in the chest. Another Latin Kings member — John Doe 7 — was also believed to have been present for the stabbing.

In response to the stabbing, FLS clique members met at a public park in Nassau County to discuss retaliation against the Latin Kings. Present for the meeting, among others, were FLS members Alas Leon, Carlos Alvarado, Erick Galdamez Leon, and Jose Mejia Hernandez. Velasquez Larin and Espinoza Sanchez participated in the meeting by telephone. During the meeting, Velasquez Larin ordered the FLS clique members to kill John Doe 7 and John Doe 8. Shortly after the meeting in the park, on the evening of August 2, 2021, Galdamez Leon and a

---

[5]    Although no defendant in the October 2025 trial is charged with the attempted murder of John Doe 6, the government intends to admit evidence of this conduct at trial to prove the existence and nature of the racketeering enterprise, as well as to provide context for the charged retaliatory conduct.

member of another MS-13 clique shot at John Doe 7 multiple times, and John Doe 7 sustained one gunshot wound to the ankle.

IX.     The Attempted Murder of John Doe 9

In or about September 2021, another Latin Kings member — John Doe 9 — posted to Facebook a video of himself walking in MS-13 territory in Westbury, New York.  FLS members saw the video and agreed to kill John Doe 9 in retaliation for his provocation.

In the early morning hours of September 15, 2021, FLS member Tylor Salmeron and another FLS member saw John Doe 9 near Bunky Reid Park in Westbury, New York. Salmeron called Alvarado and Perez Ovando, who instructed him not to lose track of John Doe 9. Alvarado and Perez Ovando informed Hernandez Baires that they had spotted a rival Latin King. Hernandez Baires informed Velasquez Larin, who told Hernandez Baires to give the go-ahead to Alvarado and Perez Ovando to kill John Doe 9.

Approximately one hour later, Alvarado and Perez Ovando, both armed with guns, arrived at the park and confronted John Doe 9.  John Doe 9 fled the park and tried to enter a nearby house, but Alvarado and Perez Ovando caught up to John Doe 9 and shot him in the face.  Alvarado and Perez Ovando attempted to shoot John Doe 9 additional times, but their guns jammed.  The men also threw a cinderblock and cement planters at John Doe 9 while he was on the ground.

X.     The Murder of Oswaldo Gutierrez Medrano

In February 2022, Velasquez Larin and Diaz Amaya ordered the murder of 20-year-old Oswaldo Gutierrez Medrano, a member of the Sailors Locos Salvatruchas clique.  The plan was to lure Gutierrez Medrano to a location under the guise of giving him a beating (which Gutierrez Medrano would believe was part of a gang initiation), where he would then be murdered.  A member of PVLS and several members of the FLS clique — including Hernandez

8

Baires, Galdamez Leon, and Jose Mejia Hernandez — scouted a place to carry out the murder and identified a wooded area.

On February 13, 2022, Gutierrez Medrano met with the PVLS member and FLS members — including Arevalo Iraheta, Hernandez Baires, Alvarado, Galdamez Leon, and Mejia Hernandez — to receive what he believed would be only a beating.[6] After beginning their assault with the feigned beating, the FLS members ultimately killed Gutierrez Medrano with machetes and knives, dismembered his body, and buried him in the wooded area.

## XI.    Additional Crimes

The defendants face additional charges as well, including weapons possession, narcotics trafficking, and money laundering.

## ARGUMENT

An anonymous and partially sequestered jury is necessary to assure the public's right to a fair trial by protecting the jury from improper influence or intimidation. Moreover, these precautions will not deprive the defendants of meaningful jury selection, diminish the presumption of innocence, or cause any prejudice.

## I.    Legal Standards

The Second Circuit has repeatedly upheld the use of anonymous and partially sequestered juries to protect the integrity of a trial and ensure an impartial jury. See, e.g., United States v. Napout, 963 F.3d 163, 189 (2d Cir. 2020); United States v. Prado, 634 F. App'x 323, 325 (2d Cir. 2016); United States v. Kaziu, 559 F. App'x 32, 38 (2d Cir. 2014); United States v. Ibrahim, 529 F. App'x 59, 65 (2d Cir. 2013); United States v. Kadir, 718 F.3d 115, 120-21 (2d Cir. 2013); United States v. Pica, 692 F.3d 79, 81 (2d Cir. 2012); United States v. Quinones, 511

---

[6]    The government will admit evidence at trial that Perez Ovando was also present but waited in the car during the murder.

F.3d 289, 291 (2d Cir. 2007); United States v. Gotti, 459 F.3d 296, 345 (2d Cir. 2006); United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995); United States v. Wong, 40 F.3d 1347, 1376-77 (2d Cir. 1994); United States v. Thai, 29 F.3d 785, 800-01 (2d Cir. 1994); United States v. Amuso, 21 F.3d 1251, 1264-65 (2d Cir. 1994); United States v. Locascio, 6 F.3d 924, 946-47 (2d Cir. 1993); United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991); United States v. Vario, 943 F.2d 236, 239 (2d Cir. 1991); United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989); United States v. Persico, 832 F.2d 705, 717 (2d Cir. 1987); United States v. Thomas, 757 F.2d 1359, 1364-65 (2d Cir. 1985); United States v. Barnes, 604 F.2d 121, 133-43 (2d Cir. 1979).

The Second Circuit has adopted a two-step process for district courts to follow in connection with empaneling an anonymous jury. A district court should first determine whether there is strong reason to believe that the jury needs protection. If there is, the court should then take reasonable precautions to minimize any prejudice that might arise from an anonymous jury. See Paccione, 949 F.2d at 1192 (collecting cases). Importantly, "the use of an anonymous jury does not infringe a defendant's constitutional rights, so long as the court conducts a careful voir dire designed to uncover any bias as to the issues or the defendants and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities." Aulicino, 44 F.3d at 1116. Thus, "the decision whether or not to empanel an anonymous jury is left to the district court's discretion." Paccione, 949 F.2d at 1192.

Courts in this Circuit consider various factors to determine whether there is reason to believe the jury's safety and/or impartiality needs protection: (1) the dangerousness of the defendants, (2) whether the defendants or their associates have engaged in past attempts to interfere with the judicial process, (3) whether the defendants, by themselves or through their

associates or criminal organization, have access to the means to harm the jury, and (4) whether the trial is likely to attract media attention and publicity. See United States v. Wilson, 493 F. Supp. 2d 397, 398 (E.D.N.Y. 2006) (citing, inter alia, Paccione, 949 F.2d at 1192; Vario, 943 F.2d at 240; and Tutino, 883 F.2d at 1132-33 (2d Cir. 1989)); United States v. Cacace, 321 F. Supp. 2d 532, 534 (E.D.N.Y. 2004). All of these factors need not be present; "anonymity is appropriate when some combination of these factors is present." United States v. Ashburn, No. 13-CR-0303 (NGG), 2014 WL 5800280, at *3 (E.D.N.Y. Nov. 7, 2014) (collecting cases).

A.   Dangerousness

Courts generally assess defendants' dangerousness by the seriousness of the charged crimes, including whether the defendants are charged with participating in a large-scale criminal enterprise. See, e.g., Gotti, 459 F.3d at 346 (noting defendants were charged with membership in an organized crime family); Wilson, 493 F. Supp. 2d at 399-401 (noting defendant was charged with murdering two police officers and was a member of a violent gang); United States v. Brown, No. 20-CR-293 (WFK), 2022 WL 4586302, at *5 (E.D.N.Y. Sept. 29, 2022) (noting that the allegations were particularly "concerning for juror safety because [certain] Defendants [were] alleged leaders of [the criminal enterprise]").

In assessing this factor, courts also consider whether "it is likely that the nature of the charges and evidence in th[e] case would cause reasonable jurors to perceive Defendants as dangerous." Ashburn, 2014 WL 5800280, at *6; accord, e.g., Brown, 2022 WL 4586302, at *4. As the Second Circuit in Barnes, explained:

> If a juror feels that he and his family may be subjected to violence or death at the hands of a defendant or his friends, how can his judgment be as free and impartial as the Constitution requires? If the anonymous juror feels less pressure as a result of anonymity, . . . this is as it should be a factor contributing to his impartiality.

11

604 F.2d at 140-41 (internal quotation marks and citation omitted) (affirming district court's use of an anonymous, sequestered jury because it "comported with its obligation to protect the jury, to assure its privacy, and to avoid all possible mental blocks against impartiality"). Similarly, in Thomas, the Second Circuit found that the protection of jurors is vital to the function of the criminal justice system and further articulated the importance of using jury anonymity as a mechanism to ensure a jury's fair and impartial verdict free from fear or intimidation:

> As a practical matter, we cannot expect jurors to "take their chances" on what might happen to them as a result of a guilty verdict. Obviously, explicit threats to jurors or their families or even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict.

757 F.2d at 1364.

B.    Past Attempts and Present Ability to Interfere with the Judicial Process

"[T]o support a finding that an anonymous jury is warranted, obstruction of justice charges need not relate to prior jury tampering efforts, but instead may relate solely to efforts to tamper with witnesses or otherwise obstruct the judicial process." United States v. Suarez, No. 16-CR-403 (JFB), 2020 WL 7699663, at *2 (E.D.N.Y. Dec. 28, 2020); see also, e.g., Aulicino, 44 F.3d at 1116 (noting defendants had an associate threaten a witness's life and offer $50,000 for the witness's silence); Paccione, 949 F.2d at 1192-93 (noting government witness had received anonymous, middle-of-the-night phone calls advising him to "remember[] nothing" and a defendant had threatened others with a baseball bat and pistol); Vario, 943 F.2d at 240 (noting co-conspirator had approached grand jury witness).

"Whether Defendants have engaged in prior attempts to interfere with the judicial process, however, is not the only relevant question with respect to this factor. Instead, courts 'may appropriately consider a defendant's propensity to threaten witnesses or otherwise to tamper with the judicial process in evaluating the need for an anonymous jury.'" Ashburn, 2014

WL 5800280, at *10 (quoting Quinones, 511 F.3d at 296 n.6).  In assessing a defendant's propensity to tamper with the judicial process, "district courts in this circuit have frequently taken into account the severity of the defendant's anticipated criminal punishment."  Id. (collecting cases).

When a defendant is detained, whether he has means to harm the jury often hinges on the extent of his connections outside of prison.  See, e.g., Wilson, 493 F. Supp. 2d at 400 (granting a motion for an anonymous jury in part because defendant was "a member of the Stapleton Crew and . . . this organization has other members and associates who are currently, and will be, at large at the time of the trial") (internal quotation marks omitted).  "In numerous cases, courts in this Circuit have found that defendants' membership in a criminal organization with members still at large demonstrates an ongoing ability to interfere with the judicial process."  United States v. Mayes, No. 12-CR-385 (ARR), 2013 WL 6175824, at *3 (E.D.N.Y. Nov. 25, 2013) (collecting cases).

C.    Publicity

Finally, whether the trial is likely to attract media attention may be illustrated by the nature and degree of pretrial publicity.  See, e.g., Paccione, 949 F.2d at 1193 (noting the case had already been "front-page news").  The relevant inquiry is "not whether the pre-trial media attention has been significant on its own, but whether this attention reasonably suggests that there will be significant news coverage during the trial."  Ashburn, 2014 WL 5800280, at *12; Vario, 943 F.2d at 240 (citing a single New York Newsday cover story).

II.   There Is Strong Reason to Believe that the Jury Needs Protection in this Case

Each factor above demonstrates reason to believe that the jury needs protection in this case and that an anonymous and partially sequestered jury is warranted.  Indeed, courts in the Eastern District of New York have consistently empaneled anonymous and partially

sequestered juries in similar cases involving violent crimes committed by members and associates of MS-13 on behalf of the gang. See United States v. Amador Rios, No. 18-CR-398 (RPK), ECF No. 182 (February 27, 2023); United States v. Escobar, No. 21-CR-101 (JFB), ECF No. 49 (December 3, 2021); United States v. Contreras, et al. (Suarez), No. 16-CR-403 (JFB) (February 27, 2019); United States v. Contreras, et al. (Catalan), No. 16-CR-403 (JFB) (October 12, 2018); United States v. Cerna, et al., No. 15-CR-087 (JFB) (April 8, 2016); United States v. Edwin Hernandez, No. 12-CR-063 (JFB), ECF No. 415 (January 6, 2015); United States v. Alvarenga, et al., No. 12-CR-063 (JFB), ECF No. 330 (May 28, 2014); United States v. Adalberto Ariel Guzman, No. 10-CR-074 (JFB), ECF No. 1307 (July 10, 2013; decision not reflected on minute entry); United States v. Heriberto Martinez/Carlos Ortega, Nos. 10-CR-074/12-CR-293 (JFB), ECF Nos. 1104/47 (respectively) (December 19, 2012); United States v. Prado, No. 10-CR-074 (JFB), ECF No. 623, and 2011 U.S. Dist. LEXIS 86631 (Aug. 5, 2011). As explained below, the reasons justifying the decisions in the above-cited cases also justify an anonymous and partially sequestered jury in this case.

A.    The Defendants Are Dangerous

The dangerousness of these defendants and the seriousness of the charges cannot reasonably be disputed. The defendants are all charged with various violent crimes, including murder in aid of racketeering, for their participation in four separate murders, as well as several additional murder conspiracies and three additional shootings. At trial, the evidence will prove that the murder plots at issue involved significant planning and in at least one instance was motivated in part by a desire to kill an individual who had cooperated with law enforcement. The trial evidence will also include testimony and other evidence about other violent crimes carried out by MS-13 and the rules of the gang, which unequivocally encourage the murder of individuals who cooperate with law enforcement. The trial evidence will also establish that two

14

of the defendants are national MS-13 leaders with authority over MS-13 members around the country.

These facts favor empaneling an anonymous and partially sequestered jury because not only are the defendants in fact dangerous; there is also a real risk that, after hearing evidence about the violent crimes carried out by the defendants and their co-conspirators, and the rules of the gang, the jurors may fear retribution from MS-13 if they pass judgement on the defendants. In several recent cases in this District involving violent crimes, jurors have had to be excused after they expressed that they were too afraid of the defendants or their co-conspirators to remain on the jury. See United States v. Qing Ming Yu & Zhe Zhang, No. 22-CR-208 (CBA); United States v. Lamonte Johnson, No. 19-CR-221 (RJD). In 2019, a court in this District was forced to declare a mistrial in an MS-13 case after jurors expressed fear that the defendants' families were targeting them. See United States v. Jose Suarez, No. 16-CR-403 (JFB). And in a December 2024 felon-in-possession case, a court in this District was compelled to excuse a juror because she "had nightmares, trouble sleeping, and suffered panic attacks out of fear that if she rendered a verdict, the Defendant might order a hit on her" — fears that prompted her to ask if the jury was anonymous (it was not). United States v. Montanez, No. 23-CR-186 (NGG) (E.D.N.Y. Nov. 25, 2024), ECF No. 75 at 4. This last incident, in particular, illustrates that a juror may become paralyzed by fear of violent retribution even in a case that — much unlike here — involves no allegations of violence or a criminal enterprise with a reputation for violence, and that a lack of anonymity contributes to jurors' concerns about their safety.

B.  The Defendants and Their Associates Have Evinced a Clear Intent and Ability to Interfere with the Judicial Process

MS-13 members and associates in this District have repeatedly attempted to interfere with the judicial process. See Suarez, 2020 WL 7699663, at *5 ("There are numerous

instances of Long Island MS-13 members attempting to interfere with the judicial process, including retaliating against individuals believed to have cooperated with law enforcement authorities.").  Moreover, members of MS-13 routinely seek retaliation against individuals believed, correctly or incorrectly, to have cooperated with law enforcement authorities, or against their loved ones — this is a tenet of the gang.  Indeed, in granting the government's motion for an anonymous and partially sequestered jury in a case involving murders committed on behalf of MS-13, the Honorable Joseph F. Bianco, in describing the MS-13 gang, stated "we have a criminal organization here which part of their rules is to kill people who cooperate or are suspected of cooperating and that creates the most heightened concern about jury tampering or obstruction of justice.  I have no reason to believe that this criminal organization which has resorted to such extreme acts of obstruction would not seek to tamper with a jury if it had the opportunity to do so.  Certainly having the names of the jurors makes that a lot easier."  United States v. Escobar, No. 21-CR-101 (JFB), ECF No. 49 (transcript of proceedings held on Dec. 3, 2021, at page 30).

For example, below is a non-exhaustive list of occasions when local MS-13 members and associates engaged in witness tampering, witness retaliation, and obstruction of justice to benefit not only themselves but also codefendants and fellow gang members.

- In July and August 2023, Melvi Amador Rios, also known as "Letal" and "Pinky," the leader of the Centrales Locos Salvatruchas ("CLS") clique of MS-13, was tried and convicted by a jury of racketeering, murder in aid of racketeering and four armed robberies, among other charges.  See United States v. Amador Rios, No. 18-CR-398.  In 2017, Amador Rios had ordered the brutal stabbing murder of a low-level CLS member who Amador Rios and other CLS members wrongly suspected of cooperating with law enforcement.  The spouse of a civilian witness who testified against Amador Rios received threats of violence in retaliation for the witness's testimony against Amador Rios.

- In February 2020, an MS-13 associate, Axel Argueta, beat an individual named Wilmer Maldonado in the head with a baseball bat, killing him.  Argueta

murdered Maldonado because Maldonado was a witness to an October 2018 assault committed by multiple MS-13 members and was anticipated to testify at a trial against those MS-13 members. Argueta pleaded guilty.[7]

- On May 2, 2019, during the trial of MS-13 member Jose Suarez, a cooperating witness was threatened by a group of MS-13 members while waiting in a U.S. Marshals holding cell to be brought to the courtroom for testimony. The other MS-13 members had been produced to court for a status conference on the same day as the cooperating defendant. Aware of the trial and the cooperating witness's ongoing testimony, the MS-13 members yelled to the cooperating witness, threatening his life and the mother of his child. Specifically, the gang members told the cooperating defendant "[t]hat they were going to kill [him], and to tell the mother of [his] daughter to be careful." See United States v. Jose Suarez, 16-CR-403, Trial Tr. 247-248.

- In August 2017, six members of the Downtown Criminales clique of MS-13 lured Carlos Rivas-Majano, who they believed had cooperated with law enforcement in an earlier MS-13 murder prosecution against other MS-13 members, to a wooded area in Uniondale, Long Island and hacked him to death with machetes. The six participants all pleaded guilty to the murder.

- MS-13 believed that a member of the Jamaica Locos Salvatruchas ("JLS") clique of MS-13, who was arrested by federal authorities and incarcerated at the Metropolitan Detention Center ("MDC"), was cooperating with the government. In 2017, officials at the MDC recovered a letter indicating that MS-13 members suspected that this defendant was cooperating and that they had put a "green light" on him, authorizing other MS-13 members to kill him.

- Members of the MS-13 suspected that Jose Pena, who was a member of the Normandie Locos Salvatruchas clique of the MS-13, had violated the rules of MS-13 by cooperating with local law enforcement and/or being gay, and decided to kill Pena. On June 3, 2016, members of the MS-13, including Elmer Alexander Lopez and Jerlin Villalta, lured Pena into a wooded area and attacked and killed him with knives. Thereafter, Lopez and Villalta were arrested and indicted on charges of conspiracy to commit murder in aid of racketeering and murder in aid of racketeering. See United States v. Contreras, No. 16-CR-403. Both Lopez and Villalta pleaded guilty to this murder in 2018.

- Two members of the Brentwood Locos Salvatruchas clique of MS-13, Sergio Cerna and Arnolovin Umanzor-Velasquez, were charged and convicted in connection with the December 18, 2011, murders of two MS-13 members, Enston Ceron and Ricardo Ceron, who were murdered because Enston Ceron was not complying with the rules of the gang and MS-13 was concerned that he might

---

[7]    The government anticipates admitting evidence at trial that members of FLS, including co-defendant Galdamez Leon, participated in this murder.

cooperate if he was arrested by law enforcement authorities. Cerna and Umanzor-Velasquez pleaded guilty and admitted to killing the Ceron brothers for that reason. Further, Cerna was convicted of attempting to murder a good Samaritan in order to prevent him from testifying regarding Cerna and Umanzor-Velasquez's participation in the murders of the Ceron brothers. See United States v. Cerna, No. 15-CR-87.

- Two cooperating defendants, who were expected to testify in the June 2014 trial of Edwin Acosta-Martinez and co-defendants Jeffrey Rosales and Velasquez, informed the government that threats were relayed to their family members and/or friends by MS-13 members and associates, because of the witnesses' anticipated testimony.

- On March 15, 2014, MS-13 member Carlos Velasquez, who belonged to the Huntington Criminales Locos Salvatruchas clique, and another MS-13 member, Raul Escobar-Saravia, attacked another inmate at the MDC with metal locks placed inside of socks, striking the victim repeatedly with the locks and sending him to the hospital for injuries throughout his body. When Velasquez was asked why they assaulted the other inmate, he responded that "[the victim] is a snitch."

- Sidney Valverde was a member of the JLS clique of MS-13. Byron Lopez, a member and then leader of JLS, suspected that Valverde was cooperating with law enforcement and was "ratting" on other MS-13 members. Lopez put a "green light" on Valverde, authorizing other MS-13 members to kill him. On February 25, 2014, several MS-13 members, including Oscar Welman Espinoza-Merino, Milton Contreras and Jose Osmin Rubio, lured Valverde to a beach. Espinoza-Merino, Rubio and Contreras allowed Valverde to walk ahead, and then Contreras shot Valverde once in the back of the head. Lopez, Espinoza-Merino, Rubio, and Contreras were arrested and indicted for conspiracy to commit murder in aid of racketeering, murder in aid of racketeering, obstruction of justice murder, discharge of a firearm in connection with a crime of violence and discharging a firearm resulting in death. United States v. Lopez, No. 14-CR-463. Subsequently, Lopez, Espinoza-Merino, Rubio, and Contreras pleaded guilty to charges relating to the Valverde murder.

- MS-13 members wrongly believed that a member of MS-13, who was arrested by federal authorities and incarcerated at the MDC was cooperating with the government. On June 28, 2011, MS-13 members, including Diego Ninos, lured the victim into a jail cell, placed a noose around the victim's neck, and repeatedly struck the victim with locks placed inside of socks. Ninos, who had previously pleaded guilty to conspiracy to commit murder in aid of racketeering, was additionally charged with conspiracy to commit assault in aid of racketeering, assault in aid of racketeering, and witness retaliation. United States v. Prado, et al., No. 10-CR-074 (S-4). Ninos pleaded guilty to witness retaliation.

The above-described crimes demonstrate MS-13's and the defendants' unequivocal commitment to interfering with the judicial process and ability to do so.  See Suarez, 2020 WL 7699663, at *6 ("Taken together, the Court finds that these allegations—namely, that the defendant is associated with [MS-13,] a large-scale criminal enterprise with a history of violence, a demonstrated willingness and ability to tamper with the judicial process, and numerous members still at liberty—weigh strongly in favor of jury anonymity.").

Moreover, all of the defendants here face mandatory life sentences if convicted at trial, which provides a strong incentive to tamper with the jury and thus weighs in favor of the requested precautions.  See, e.g., Ashburn, 2014 WL 5800280, at *10 (finding in a gang case involving murder that "the substantial prison sentences that could be imposed upon conviction, including multiple life sentences, surely provide these Defendants with incentive to engage in witness or jury tampering"); Mayes, 2013 WL 6175824, at *4 (concluding seriousness of the charges weighed in favor of anonymous and partially sequestered jury where defendants faced "lengthy prison sentences" for, inter alia, murder in aid of racketeering "creating a stronger motive to tamper with a jury").

The evidence also suggests that incarcerated MS-13 members have ready access to contraband cellular devices.  For example, on December 2, 2024, MDC employees recovered a package containing eighteen cellular devices that, based on the circumstances, appeared destined for the MS-13 unit at the MDC.  See Complaint, United States v. Jairon Ortega-Corea (E.D.N.Y. Feb. 18, 2025), ECF No. 1.  A search of the MS-13 unit shortly thereafter led to the recovery of two cellular phones and several homemade weapons.  Id.  The government intends to admit evidence at trial that one of these two phones was primarily used by Velasquez Larin. MS-13 members use such contraband devices to communicate with fellow gang members and

associates who are located at other jail facilities or are at liberty around the country, greatly increasing their ability to tamper with the judicial process.

### C.    The Anticipated Media Coverage Will Expose the Jurors to Pressure

This case has garnered significant attention from both national and local media sources.  See, e.g., Brutal MS-13 gang leaders 'Tiny' and 'Splinter' indicted in grisly machete murders in NYC, Long Island: feds, N.Y. Post (Nov. 4, 2024), https://nypost.com/2024/11/04/us-news/brutal-ms-13-gang-leaders-tiny-and-splinter-indicted-in-grisly-machete-murders-in-nyc-long-island-da; Alleged MS-13 gang members charged with new killings in Queens, Long Island, U.S. Attorney says, Newsday (Nov. 4, 2024); National MS-13 gang leader, 22 members indicted for "cold-blooded" murders, CBS News (June 21, 2023), https://www.cbsnews.com/news/ms-13-gang-leader-22-members-indicted-new-york-new-charges-edenilson-velasquez-larin.  This includes extensive coverage of the murder of Abel Mosso, which was detailed in the government's November 8, 2024, motion for an anonymous jury.  See ECF No. 620.  Given the extensive prior media coverage and the nature of this case, the extraordinary focus on MS-13 in the news media, and the high-ranking nature of the defendants, it is foreseeable that there will continue to be press interest in the upcoming trial.

*            *            *

In light of the above, there is reason to believe that the jury's safety and/or impartiality needs protection in this case.

### III.    An Anonymous Jury Will Not Prejudice the Defendants

As explained above, once a district court determines that there is strong reason to believe that the jury needs protection, it may empanel an anonymous and partially sequestered jury provided it takes reasonable precautions to minimize any potential prejudice to the defendant.  See, e.g., United States v. Bellomo, 263 F. Supp. 2d 557, 559 (E.D.N.Y. 2003)

20

(granting motion for anonymous jury and noting the requirement "that a balance be struck between the government's interest in the integrity of the judicial process and the defendant's interest in preserving and safeguarding the presumption of innocence"); Thai, 29 F.3d at 801; Amuso, 21 F.3d at 1264-65; Paccione, 949 F.2d at 1192; Vario, 943 F.2d at 239; Tutino, 883 F.2d at 1132; Persico, 832 F.2d at 717-18; Thomas, 757 F.2d at 1365. A defendant has two legitimate concerns that are potentially affected by a decision to empanel an anonymous and partially sequestered jury: (1) the right to make informed choices during the jury selection process, and (2) the right to be tried by jurors who are not prejudiced by reason of their anonymity or partial sequestration. Both of these concerns can be readily addressed.

A.    An Anonymous Jury Will Not Hinder the Defendants' Ability to Make Informed Choices During Jury Selection

Although a defendant has the right to a meaningful voir dire of potential jurors, what questions are asked in voir dire largely rests within the informed discretion of the trial judge. See United States v. Silva, 715 F.2d 43, 50 (2d Cir. 1983) (absent a clear abuse of discretion, trial court's ruling on questions to be asked will not be disturbed); United States v. Barnes, 604 F.2d 121, 137-40 (2d Cir. 1979) (noting that "[a]s long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the cases and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal").

The information that will be kept from the parties and counsel if this motion is granted — specifically, the names, addresses and places of employment of prospective jurors — is not crucial to the jury selection process. In selecting jurors, the parties will learn, among other things, the general geographic area in which prospective jurors reside, the general nature of their employment, their age, and the level of their formal education. The names of prospective jurors,

21

to the extent they provide information about ethnicity, are not needed for a meaningful <u>voir</u> <u>dire</u>. See <u>Georgia v. McCollum</u>, 505 U.S. 42 (1992) (rule articulated in <u>Batson</u>, prohibiting use of peremptory challenges in racially discriminatory manner, applies to defendant).  The common practice in this District of extensive <u>voir</u> <u>dire</u> further acts to safeguard the defendants' rights.  <u>See</u> <u>Brown</u>, 2022 WL 4586302, at *7 (defendants would not be prejudiced by anonymous jury where court would "conduct a robust <u>voir dire</u>" including "sufficiently thorough and detailed questions to potential jurors to elicit the information necessary for the parties to make meaningful decisions in jury selection . . . without asking for precise home addresses or employer names"); <u>Suarez</u>, 2020 WL 7699663, at *7 ("[T]he Court finds that the defendant's right to a fair and impartial jury will be sufficiently protected by a careful and searching <u>voir</u> <u>dire</u>, which will be designed to uncover bias and consequently will allow the defendant to meaningfully exercise his challenges.").

 B.   <u>The Court Can Explain the Reasons for Anonymity to Prospective Jurors in Neutral Terms That Will Eliminate the Risk of Prejudice to the Defendants</u>

Numerous courts have recognized that, where anonymity and partial sequestration are necessary, the Court can instruct the jury as to why those measures are appropriate in a neutral manner that minimizes any risk of prejudice.  Although the due process clause of the Fifth Amendment protects the presumption of innocence, "there is no <u>per</u> <u>se</u> rule that it may not be burdened."  <u>Thomas</u>, 757 F.2d at 1364; <u>see also</u> <u>United States v. Scarfo</u>, 850 F.2d 1015, 1026 (3d Cir. 1988).  Here, the burden is slight compared to the interests in safeguarding the integrity of the judicial process and can be minimized through a proper jury instruction.

Most commonly, courts have explained to jurors that their privacy and their identities require protection from the media and the public.  <u>See</u> Sand, Modern Federal Jury Instruction 1-5.  In some cases, the court has explained the jury's anonymity by telling

prospective jurors that anonymity would allow them to feel more comfortable in giving candid answers to the personal questions asked in voir dire. Either of those examples would provide a credible explanation to prospective jurors in this case. See Brown, 2022 WL 4586302, at *7 ("[T]he Court will instruct jurors that the purpose of their anonymity is to preserve and respect their personal privacy and to minimize any interference in their personal affairs by the media and the public."). Indeed, the intense media scrutiny expected to surround the trial is, in fact, a basis for the instant motion.

As for partial sequestration, the government proposes that the jurors be told that they are being escorted in and out of the courthouse to protect their privacy and in order to ensure a timely start to each day of trial. This practice has been routinely followed in this District in recent years, and it should be followed here as well. See, e.g., United States v. Jordan, No. 20-CR-305 (LDH); United States v. Amador Rios, No. 18-CR-398 (RPK); United States v. Kelly, No. 19-CR-286 (AMD); see also Suarez, 2020 WL 7699663, at *8 (to the extent partial sequestration raises any potential prejudice, "the Court finds that such prejudice can be avoided through the use of the same neutral instruction that will be given to the jury regarding anonymity").

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that the Court empanel an anonymous and partially sequestered jury in the upcoming trial against the defendants.

Dated:    Brooklyn, New York
          April 11, 2025

                              Respectfully submitted,

                              JOHN J. DURHAM
                              UNITED STATES ATTORNEY
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201


               By:    _____/s/_____
                              Jonathan Siegel
                              Anna L. Karamigios
                              Kamil R. Ammari
                              Assistant United States Attorneys
                              (718) 254-7000