

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JRS/ALK/NEM                                 *271 Cadman Plaza East*
F. #2020R00146                              *Brooklyn, New York 11201*

July 2, 2025

<u>By ECF</u>

The Honorable LaShann DeArcy Hall
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Oscar Flores-Mejia
           <u>Criminal Docket No. 20-228 (S-2) (LDH)</u>

Dear Judge DeArcy Hall:

      The government respectfully submits this letter in connection with the defendant's sentencing, currently scheduled for August 27, 2025.

      As set forth in detail below, the defendant — along with his co-conspirators Juan Amaya-Ramirez, Jose Lazo-Villa, and Leyla Carranza — brutally murdered 17-year-old Andy Peralta. No amount of effort in writing this submission or arguing this case can convey the horror of the defendant's crime. The defendant and his co-conspirators took it upon themselves to stalk and murder a child, for no reason other than a desire to get into and move up the ranks of MS-13 in the United States. The suffering Andy Peralta experienced as he was beaten and choked to death, terrified and alone, cannot be imagined. He is never coming home. And his family's lives have been shattered.

      The defendant was the driving force behind the murder. He recruited Lazo-Villa and Carranza into the murder. He gave the order to attack Peralta at the start of the murder. He is the one who stomped on Peralta's face and head while Amaya-Ramirez choked Peralta to death. And he is the one who stuffed dirt into Peralta's mouth to stifle his screams for his parents. Even after Peralta was dead, the defendant stabbed and mutilated his corpse and posed over his body for a trophy photograph. And he did all of this for no purpose other than his own twisted belief that it would help him advance within MS-13.

      In light of the extreme circumstances of this case, the government respectfully submits that a sentence of not less than 50 years' imprisonment is appropriate.

I.     <u>Background</u>

       A.     <u>The Life of Andy Peralta</u>

       Andy Peralta was born in May 2000 in Ecuador, where his family lived in poverty.  When he was two years old, his parents left to the United States to find work, leaving Peralta with his grandmother.  His parents ultimately settled in Queens, where his father worked in construction and his mother cleaned houses and restaurants while studying to become, and eventually becoming, a manicurist.

       For over a decade, Peralta's parents worked to save money to bring him here to be with them.  Eventually, they were able to hire an attorney to obtain a visa for him.  At 15, he immigrated to the United States, where he was reunited with his parents and with his younger brother, who had been born here.

       Peralta's transition to the United States was difficult at first.  In addition to the stresses of a new life in a new country, he had been away from his family for years, and he carried some resentment that they had not brought him with them in the first place.  His parents worked seven days a week.  For a time, Peralta struggled in school and hung out with members of the 18th Street gang.

       That began to change in October 2017, when Peralta started dating his girlfriend. They spent almost every day together, with Peralta's girlfriend coming to his home after school, and him walking her home at the end of the day.  According to officials at his high school and friends of Peralta interviewed as part of the investigation, Peralta's grades and attitude all improved after he began dating his girlfriend, and he stopped associating with members of 18th Street.  Over time, his relationship with his parents improved as well.

       As 17-year-olds sometimes do, Peralta and his girlfriend engaged in many displays of puppy love.  They exchanged rings to symbolize wedding bands.  They wore matching necklaces with half-heart charms, inscribed with each other's names and the date of their anniversary, that would combine to form a full heart.  And at some point, they obtained matching crown tattoos on their chests, with Peralta getting a blue king's crown with his girlfriend's name under it, and his girlfriend getting a red queen's crown with Peralta's name written under it.  A photograph of Peralta's tattoo (on the left) and a photograph of Peralta with his girlfriend (on the right), with her tattoo visible (but her face redacted), are shown below:

2



On April 23, 2018, Peralta came home from school with his girlfriend, as he did almost every day. His mother gave his girlfriend a facial, and he sat with his mother and served her dinner. His mother later went to pick up Peralta's younger brother. When she came home, Peralta had already walked his girlfriend home and was getting ready to go out again. He said he was meeting a girl at a park and would be home soon. He left at around 6:45 p.m.

When Peralta did not return home within a few hours, his family grew worried. His father called him. His girlfriend called him. According to phone records, between 9:27 p.m. and 12:39 a.m., his mother called him a dozen times, with each call going to voicemail. At approximately 1:30 a.m., they reported him missing to the police.

They never saw him alive again.

B.      The Murder of Andy Peralta

The government proved the following facts regarding Peralta's murder at the Fatico hearing in United States v. Leyla Carranza, No. 20-CR-228 (LDH).[1]

---

[1]      The Second Circuit has repeatedly held that for purposes of sentencing, a district court may properly rely on testimony from a prior proceeding, even where the defendant was not a part of the prior proceeding and had no opportunity to cross-examine witnesses. See United States v. Carmona, 873 F.2d 569, 574 (2d Cir. 1989) (court properly relied on cooperator's trial testimony at sentencing for defendant who had not been part of trial; "It is not a denial of due process for the trial judge, when determining sentence, to rely on evidence given by witnesses

The defendant and Amaya-Ramirez had been associates of MS-13 in El Salvador. The defendant befriended Lazo-Villa at high school and introduced Lazo-Villa to MS-13, including MS-13 rules and MS-13 music.  The defendant also introduced Lazo-Villa to Amaya-Ramirez, who went by the gang nickname "Cadaver."

In June 2017, before Peralta stopped associating with members of the 18th Street gang, one of Peralta's friends posted a Facebook Live video showing a group of people singing together in a car, including Peralta.  At one point in the video, Peralta made an 18th Street gang sign.  A still image from the video showing Peralta making the gang sign is shown below.



whom the defendant could neither confront nor cross-examine."); see also United States v. Garcia, 167 F. App'x 259, 260-61 (2d Cir. 2006) (rejecting argument that "the district court improperly considered at sentencing the hearsay testimony of a cooperating witness who testified at the trial of Garcia's co-defendants, in violation of the Confrontation Clause of the Sixth Amendment"); United States v. Agyeman, 63 F. App'x 544, 546 (2d Cir. 2003) ("Judge Chin properly relied on his own knowledge of the extensive record in the trial of Agyeman's co-defendants, at which he presided.").

In approximately early 2018 (after Peralta had stopped associating with 18th Street), the defendant sent the Facebook post to Lazo-Villa.[2]  The defendant, Amaya-Ramirez, and Lazo-Villa ultimately agreed to kill Peralta.  The defendant suggested that they should find someone to lure Peralta to a park where they could ambush him, and he ultimately recruited Amaya-Ramirez's 17-year-old girlfriend, Carranza, to serve as the lure.

For several weeks, Carranza spoke to Peralta online, building a relationship with him.  Meanwhile, the defendant, Amaya-Ramirez and Lazo-Villa continued planning the murder, including identifying the location where they would kill Peralta.  Amaya-Ramirez found a broken sewer drain in Kissena Park and proposed that they should kill Peralta there and dump his body in the sewer.

Eventually, Peralta agreed to meet Carranza in Kissena Park.  When Peralta came to the park, Carranza met him outside the park and led him to the pre-planned location.  Although Peralta did not come to the sewer drain as planned, the men eventually surrounded him from behind.  Carranza walked away from Peralta to stand behind the men.  Peralta was frightened and said that he wanted his phone, which Carranza had taken.  Carranza left to go wait in Amaya-Ramirez's car, taking Peralta's phone with her.

The men asked Peralta if he was a chavala — a rival — which he denied.  Lazo-Villa eventually pulled up the Facebook video and showed it to Peralta, and Peralta admitted that he had associated with the 18th Street gang but stated that he did not any longer.  On the defendant's command, the men then began to attack Peralta.

They all beat him until they got tired.  When Peralta tried to get up, they began beating him again until they again were tired.  When Peralta still did not die, the defendant stomped on his head, while Amaya-Ramirez choked him and Lazo-Villa punched him in the stomach.  Peralta tried to scream — pleading for his life and asking for his mother and father.  To keep Peralta quiet, the defendant shoved dirt in his mouth.  When Peralta eventually stopped moving, the defendant stabbed him in the back with a kitchen knife and slashed off the crown tattoo on his chest, before handing the knife to Lazo-Villa for him to stab Peralta as well.

When the assault was over, the men took a photograph of themselves over Peralta's body.  Amaya-Ramirez took the photograph while the defendant posed with his hand on Peralta's throat.  Amaya-Ramirez's and Lazo-Villa's hands are visible in the photograph, and all three are making MS-13 gang signs.  A copy of the photograph, as found in Amaya-Ramirez's iCloud account, is shown below.

Although this photograph and the photographs below are graphic and disturbing, the government submits that it is appropriate for the Court to see evidence of the full extent of the defendants' conduct before imposing sentence.  To protect Peralta's and his family's privacy, the government respectfully requests permission to file an unredacted copy of this submission

---

[2]    It is not known how the defendant found the video or identified Peralta as a target.  It is notable, however, that Amaya-Ramirez was Facebook friends with Peralta's girlfriend and would have encountered images of Peralta through the girlfriend's social media.

under seal and to redact this photograph and the below photographs from the publicly filed version.



The men then dragged Peralta's body by his hands to a small body of water and dropped him face down in the mud. His pants and underwear came down as he was dragged. Photographs of Peralta's body as it was found the following morning, as well as the injuries to his face, neck and chest, are shown below.



The three men went to Amaya-Ramirez's car and met with Carranza. For a time, they sat and listened to MS-13 music. After Carranza told the men that she had Peralta's phone, the defendant and Amaya-Ramirez broke the phone and threw it down a drain. The group then left to buy marijuana with money they had taken from Peralta's corpse.

C.    Subsequent Events

Sometime after the murder, the defendant invited Lazo-Villa to meet him at an abandoned house. When Lazo-Villa arrived, the defendant was listening to MS-13 music. The defendant told Lazo-Villa that it was time to deliver Peralta's soul to the devil as part of a pact with the devil. Lazo-Villa declined, thinking that went too far.

Months after the murder, the defendant was deported to El Salvador. While there, he was active in MS-13 and bragged to MS-13 members there that he had murdered a person in the United States. At some point in 2020, the defendant illegally reentered the United States.

D.    The Defendant's Arrest

The defendant was arrested on February 25, 2021.



---

[3]    The government respectfully requests leave to redact







E.      The Defendant's Indictment and Guilty Plea

On March 25, 2021, the defendant was indicted for murdering Andy Peralta in aid of racketeering. See ECF No. 95. On June 15, 2023, the defendant was charged in a second superseding indictment with (1) cyberstalking resulting in death (Count Six), (2) conspiracy to murder in aid of racketeering (Count Seven), (3) conspiracy to assault in aid of racketeering (Count Eight), (4) assault in aid of racketeering (Count Nine), and (5) murder in aid of racketeering (Count Ten).

On September 6, 2024, the defendant pleaded guilty to Counts Six, Seven, Eight and Nine, pursuant to a Rule 11(c)(1)(C) plea agreement. Under the terms of his agreement, the defendant and the government jointly agreed that the Court should impose a sentence of not less than 30 years and not greater than life. The Court accepted the defendant's guilty plea and plea agreement on February 28, 2025 and agreed to impose a sentence within the agreed-upon range.

F.      The Defendant's Commitment to MS-13

The defendant has at least two sets of MS-13 tattoos. On his left hand, he has the "three dots" — an MS-13 tattoo representing the three places an MS-13 member can end up: jail, the hospital, or the graveyard. It appears that he got that tattoo after the murder and prior to his arrest, as Lazo-Villa testified that the defendant had no MS-13 tattoos at the time Lazo-Villa knew him. See Feb. 25, 2025 Fatico Tr. 74-75. The defendant additionally has tattoos of devil horns on his scalp. It appears that he got those tattoos while in jail for this offense, as they are not visible in the video of his post-arrest interview (although it is possible they are obscured by his hair, as the horn tattoos are best visible when his hair is short).

The defendant spent a period of time living with other MS-13 members in the MDC and engaged in at least one assault while in the MDC. See Presentence Investigation Report ¶ 100. According to information provided by defense counsel, ████████████████
████████████████████████████████████████████████████████████████████████████
██████████████ He was subsequently moved to a different facility.

II.     Sentencing Guidelines

The government respectfully submits that the Guidelines offense level is 44, as set forth below:

| | | |
|---|---|---|
| Base Offense Level (U.S.S.G. §§ 2A6.2(c)(1), 2A1.1) | | 43 |
| Plus: | Use of a Minor to Commit a Crime (U.S.S.G. § 3B1.4) | +2 |
| Plus: | Obstruction of Justice (U.S.S.G. § 3C1.1) | +2 |
| Less: | Acceptance of Responsibility (U.S.S.G. § 3E1.1) | -3 |
| Total: | | 44 |

13

Pursuant to application note 2 to chapter 5, part A, of the Guidelines, an "offense level of more than 43 is to be treated as an offense level of 43." An offense level of 43 and a criminal history category of I yields an advisory Guidelines sentence of life imprisonment.

The defendant stipulated to the Guidelines set forth above except that the defendant reserved the right to challenge the applicability of a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. The government submits that such an enhancement is warranted here, as the defendant "destoy[ed] or conceal[ed] evidence that [was] material to an official investigation or judicial proceeding" — specifically, Peralta's phone. U.S.S.G. § 3C1.1 application note 4(D). Numerous courts have held that destroying similar evidence, even when the destruction occurs almost contemporaneously with the crime, requires imposition of an obstruction enhancement. See United States v. DeLeon, 437 F. Supp. 3d 955, 1017-18 (D.N.M. 2020) (obstruction enhancement applied where defendant burned a victim's body and car); United States v. Bryant, 356 F. Supp. 3d 216, 221-22 (D. Conn. 2018) (obstruction enhancement applied where defendant cleaned up a murder scene after a murder); United States v. Yuselew, No. 09-CR-1035 (JB), 2010 WL 3834418, at *12 (D.N.M. Aug. 5, 2010) (obstruction enhancement applied where defendant attempted to bury murder weapon). Notably, the Guidelines were amended in 2006 to specifically extend § 3C1.1 to conduct occurring before an investigation begins if it is intended to conceal evidence from any investigation that might later occur. See United States v. Rising Sun, 522 F.3d 989, 996 (9th Cir. 2008) (attempting to destroy bloody clothing and threatening witness on night of murder did not warrant enhancement pre-2006 but would post-2006). Indeed, this Court previously found that Carranza's destruction of digital evidence shortly after the murder was sufficient to justify the enhancement.

III.     Legal Standard

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50.

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed —
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant.

18 U.S.C. § 3553(a)(1), (2). Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

IV.    Argument

The government respectfully submits that a sentence of not less than 50 years' imprisonment is appropriate.

Such a sentence reflects the extraordinary seriousness of the defendant's conduct and the need to promote respect for the law. See 18 U.S.C. § 3553(a)(1), (a)(2)(A). There is no crime more serious than premeditated murder, and the murder here was unusually heinous and senseless. Peralta was a child. He was a stranger to the defendants who had done nothing wrong, and whom the defendants targeted solely for showing the wrong gang sign in a video from almost a year earlier. The defendant gained nothing from the murder other than furthering his misguided hopes of advancing within MS-13. The defendant was the driving force behind the murder and recruited others into his plan. Moreover, his conduct after the murder demonstrates a disturbing lack of remorse. Under these circumstances, any sentence that allows the defendant to be free before true old age would fail to honor the loss of Peralta's life and would undermine respect for the law.

A sentence of at least 50 years also reflects the need for deterrence and to protect the public. See 18 U.S.C. § 3553(a)(2)(B), (C). Given the defendant's lack of remorse and commitment to the gang, there is a real risk that he will remain a danger to society for the rest of his life. It is therefore necessary that the sentence imposed both deter him from future crimes and ensure that he is not at large at any time in his life when he could potentially harm others. The sentence should also send the clearest possible message to deter others from similar conduct. That conduct includes not just murder and gang membership, but also the recruitment of minors like Carranza and Lazo-Villa, who were 17 and 16, respectively, into such crimes. While Carranza and Lazo-Villa are accountable for their conduct, it is also true that they likely would not have engaged in that conduct absent the pernicious influence of older friends and romantic partners like the defendant and Amaya-Ramirez. The catastrophic effect that influence has had on the lives of Carranza and Lazo-Villa, as well as their families, should also be taken into account. Future criminals and gang members should be forced to think twice before involving children in their schemes.

In addition, as the Supreme Court has recognized, a higher sentence is necessary to achieve general deterrence in cases, such as this one, that are difficult to solve. See Harmelin v. Michigan, 501 U.S. 957, 988 (1991) ("[S]ince deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties."). Because of the randomness of the crime, the police originally had no leads to work from. Indeed, had it not been for Amaya-Ramirez's repeated bragging about the crime, it is likely that this case never would have been solved.

15

A sentence of at least 50 years would also reflect the defendant's personal history and circumstances, including his age at the time of the murder. Absent the defendant's personal circumstances, the only sentence that would be appropriate under these facts would be life. The fact that the defendant was young — an adult, but a young adult — offers some hope, however slim, that one day the defendant might become a different person. Providing the defendant some chance of a life outside of prison also appropriately accounts for his difficult upbringing. At the same time, a sentence lower than 50 years could allow the defendant to be released in his 60s or earlier even if he fails to accumulate any good time credit at all. That outcome, which could allow him decades of freedom to spend with his family — time together that Peralta and his family were denied — would risk undermining the seriousness of the offense and the loss to the Peralta family.

Finally, the government submits that a sentence of at least 50 years would appropriately avoid unwarranted sentence disparities. See 18 U.S.C. § 3553(a)(6). That sentence would be substantially longer than the sentence for Carranza, and rightfully so given the differences in role. Indeed, every year that was discounted from Carranza's sentence for her age should be added to the defendant's sentence to account for his choice to involve her in this crime. Outside of this case, it is difficult to make comparisons, as murders often result in either a conviction at trial, normally resulting in a life sentence, or a guilty plea with a sentence negotiated by the parties without court involvement. Notably, however, courts in this District imposing sentences for murder in cases without artificial sentencing ceilings imposed by plea agreements have not hesitated to impose substantial sentences even after guilty pleas where the facts call for it. See, e.g., United States v. Somorie Moses, No. 22-CR-232 (CBA) (defendant sentenced to life imprisonment after guilty plea to one murder and numerous counts of sex trafficking); United States v. Tyshawn Corbett, No. 20-CR-213 (KAM) (defendant sentenced to 45 years' imprisonment after guilty plea to three shootings, one of which resulted in death); United States v. Josue Portillo, No. 17-CR-366 (JFB) (defendant — who was 15 at time of charged crime — sentenced to 55 years' imprisonment after guilty plea to murder of four men in a single incident). This Court should do the same here.

V.    <u>Conclusion</u>

For the foregoing reasons, the government respectfully submits that a sentence of not less than 50 years' imprisonment would be sufficient but not greater than necessary to achieve the goals of sentencing.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:        /s/
    Jonathan Siegel
    Anna L. Karamigios
    Nadia E. Moore
    Assistant U.S. Attorneys
    (718) 254-6293 (Siegel)

cc:    Clerk of the Court (LDH) (by ECF)
    Counsel of Records (by ECF)
    Michelle Malko, United States Probation Officer (by Email)