# Ballard Spahr LLP

1675 Broadway, 19th Floor
New York, NY 10019-5820
TEL 212.223.0200
FAX 212.223.1942
www.ballardspahr.com

Celia Cohen
Tel: 646.346.8002
Fax: 212.223.1942
cohenc@ballardspahr.com

August 4, 2025

*Via ECF and E-mail*

Honorable LaShann DeArcy Hall
United States District Court
Eastern District of New York
225 Cadman Plaza East, Courtroom 4H North,
Brooklyn, NY 11201

Re:   United States v. Oscar Flores-Mejia, 20 CR 228 LDH-JAM-11

Dear Judge DeArcy Hall:

We respectfully submit this sentencing memorandum and attached exhibits on behalf of Oscar Flores-Mejia, in advance of his sentencing.

Oscar stands before the Court for his participation, after just having turned 18, in the senseless murder of 17-year-old Andy Peralta. The consequences of this act are profound and irreversible. For his role in this crime, Oscar expresses his deep sorrow and unequivocal remorse. He knows that nothing he can say or do will restore what was lost. This letter is not an attempt to minimize the gravity of what occurred. Rather, it seeks to provide the Court with the context needed to reach a sentence that is fair, proportionate, and consistent with the principles of justice.





His acceptance of responsibility is reflected in his plea agreement in which he agreed to serve a minimum of 30 years in prison, knowing that once his incarceration is completed in the U.S., he will then be deported to El Salvador.

For the reasons set forth more fully below, we respectfully submit that a 30-year sentence is sufficient but not greater than necessary to serve the purposes of sentencing. Oscar will be 51 years old when he is released, after living 30 years in his prime behind bars. And he will be sent back to a country ridden will violence with no support system at that time. This is certainly a just punishment for Oscar who committed this crime when he had just barely turned 18. It reflects the gravity of the offense, affords just punishment, promotes deterrence, protects the public, and leaves open the possibility of rehabilitation. It is also firmly aligned with the outcomes imposed on similarly or more culpable defendants in comparable cases.

The government's requested a sentence of 50 years would depart sharply from sentences imposed in this District on similarly or more culpable defendants in MS-13 murder cases, including individuals with multiple homicides, significant prior records, and leadership roles. Imposing a harsher sentence on Oscar would risk creating precisely the kind of unwarranted sentencing disparity that 18 U.S.C. § 3553(a)(6) instructs courts to avoid.

### **Background**

The chain of events that culminated in Mr. Peralta's death began in early 2018, when Oscar sent Jose Lazo-Villa a Facebook video depicting Mr. Peralta flashing an 18th Street gang sign—a post that, through the distorted lens of gang culture, was interpreted as a continuing provocation. *See* Presentence Report ("PSR") ¶ 19. As the PSR makes clear, however, Mr. Peralta was no longer involved in gang activity at the time of his murder. *Id.* ¶ 23. He had left that life behind.[1]

---

[1] We understand that, based on current Second Circuit law, the Court may consider the testimony from the *Fatico* hearing in *U.S. v. Carranza*, despite the fact that Oscar was not able to cross-examine the cooperator in that case. *See United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989); *United States v. Garcia*, 167 F. App'x 259, 260-61 (2d Cir. 2006); *see also United States v. Agyeman*, 63 F. App'x 544, 546 (2d Cir. 2003). We nevertheless assert that

Oscar did not act alone or as the singular architect of this crime. The plan developed collectively among Oscar, Juan Amaya-Ramirez (an associate of the Indios Locos Salvatruchas clique), and Mr. Lazo-Villa, with Mr. Amaya-Ramirez finding the location in Kissena Park and using his girlfriend, Leyla Carranza, as the lure. *Id.* ¶¶ 16, 20-21.

On April 23, 2018, the group executed their plan. Using Mr. Amaya-Ramirez's vehicle, Oscar, Mr. Amaya-Ramirez, and Mr. Lazo-Villa picked up Ms. Carranza and went to Kissena Park. *Id.* ¶ 22. Ms. Carranza met Mr. Peralta and led him to the predetermined location, having taken his phone under the pretense of taking a photograph. *Id.* What followed was not the calculated execution the government portrays, but rather a chaotic, prolonged assault that revealed the participants' youth and lack of comprehension about the finality of their actions. The assault lasted more than thirty minutes, with the attackers ultimately exhausting themselves. PSR, ¶ 23. The disorganized, frenzied nature of the violence—including beating, strangling, and ultimately stabbing—reflects the impulsive brutality of adolescents who had lost all perspective.

The aftermath further demonstrates the participants' immaturity and panic. While the men changed out of their blood-stained clothes, they initially hid them in the park before later disposing of them. *Id.* ¶ 25. Ms. Carranza destroyed communications on Peralta's phone, and all the participants later stomped on the phone and threw it in a reservoir. *Id.*

It bears emphasis that the PSR itself acknowledges that the destruction of the phone is attributed to co-defendants Ms. Carranza and Mr. Amaya-Ramirez, not to Oscar. *Id.* ¶¶ 22 ("Peralta asked for his phone back, but Carranza did not give it to him so that she could delete her messages with Peralta so nothing could be traced to her."); *id.* ¶ 25 ("While [Oscar was] waiting in the car, Carranza destroyed all the communications with her and Peralta from Peralta's phone"). In his post-arrest statement, Oscar consistently maintained he was the first to walk away from the scene and did not see what happened to the phone. OFM000274. While Oscar may have assisted in physically destroying the phone, anyone with a cell phone knows that destroying the physical phone will not delete the messages within it that are stored on the cloud. It was Ms. Carranza's act of deleting her messages that could arguably be considered destruction of evidence.

---

the testimony that Oscar was the ringleader should be given less weight given the fact that the cooperator had an incentive to blame Oscar.

**Discussion**

**I.   The Proper Guidelines Range is 324 to 405 Months**

The Court's analysis must begin with a correctly calculated advisory Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007).  Both the government and the PSR calculates a Total Offense Level of 43 and a Criminal History Category of I, yielding an advisory sentence of life imprisonment.  Gov't Ltr. at 13–14; PSR ¶¶ 7, 89.  This calculation, however, is predicated on a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 that is unsupported by the record.  Without it, the correct offense level is 41, and the advisory Guidelines range is 324 to 405 months.

Section 3C1.1 is not a catchall penalty for any act that may impede an investigation. Rather, the government must prove by a preponderance of the evidence that the defendant engaged in conduct that was willful and undertaken with the specific purpose of obstructing justice.  *United States v. Defeo,* 36 F.3d 272, 276 (2d Cir.1994) (defendant must have "consciously acted with the purpose of obstructing justice").  Critically, this enhancement cannot be applied vicariously.  The Second Circuit has made clear that a defendant is not liable under § 3C1.1 for the obstructive acts of others absent a showing that he *personally* instructed the obstructive conduct.  *United States v. Khedr*, 343 F.3d 96, 104 (2d Cir. 2003) (holding that there was insufficient evidence to conclude that the defendant had the "specific intent" to obstruct justice to warrant the application of the enhancement). Mere knowledge of a co-defendant's conduct is insufficient.  *United States v. Coppola*, 671 F.3d 220, 248 (2d Cir. 2012) ("mere presence . . . even coupled with knowledge … or mere acquiescence . . . is not sufficient").  The focus must remain squarely on the defendant's *own* actions and *own* state of mind.

Here, the government's reliance on Section 3C1.1 rests solely on the destruction of Mr. Peralta's cell phone after the murder.  But the record contains no credible evidence—let alone the required preponderance—showing that Oscar personally participated in or directed that act.  In fact, the facts demonstrate the opposite.  In a post-arrest statement, Oscar was directly asked about the phone.  He stated that he was the first to walk away from the scene and did not see what happened to it.  OFM000274.  He has never deviated from that account. Indeed, the PSR itself attributes the obstructive conduct to the co-defendants, not Oscar.  PSR ¶¶ 22, 25.  Therefore, to apply the enhancement here would be to punish Oscar for the independent conduct of others—precisely the kind of vicarious liability courts have found do not warrant the enhancement.  *Coppola*, 671 F.3d 220, 248 (2d Cir. 2012) (noting that the district court declined to apply an obstruction of justice enhancement).

Furthermore, even if there was evidence that Oscar personally destroyed the telephone, the destruction of the cell phone should not be considered obstruction of evidence warranting an enhancement.  If it was, this enhancement would be applied in almost every criminal case, which it is not.  Indeed, virtually every crime involves some aspect of a coverup.  This enhancement, however, is almost never applied for pre-arrest conduct, especially not for deleting information from electronic media, which occurs in most crimes today.

Notably, there are very few reported cases on this issue. Of the few reported cases cited by the government, only one is in the Second Circuit and all of them involve much more egregious conduct that is unmistakably calculated to obstruct justice. In fact, they all consist of two categories of egregious conduct: (1) destruction of the body (blowing up a house to hide a corpse (*United States v. Bryant*, 356 F.Supp. 3d 216, 221-22 (D. Conn. 2018)), burning the body (*United States v. DeLeon*, 437 F. Supp. 3d 955, 1017-18 (D.N.M. 2020))) or (ii) classic obstructive conduct, including threatening to kill the witness and/or hiding the murder weapon (*United States v. Rising Sun*, 522 F.3d 989, 996 (9th Cir. 2008) and *United States v. Yuselew*, No. 09-CR-1035 (JB), 2010 WL 3834418, at *12 (D.N.M. Aug. 5,2010)). Burning a body to hide the crime or threatening witnesses are specifically designed to obstruct justice. In contrast, the destruction of the phone here is consistent with the impulsive and chaotic actions of these youths. While this Court found that Ms. Carranza's deletion of the messages warranted an enhancement, that act was specifically designed to avoid detection; the physical destruction of the phone is not. Indeed, Peralta's body was left in the park, so the destruction of the phone was not necessarily an act to hide the crime.

Finally, and most persuasively, this enhancement was not applied in a recent case involving the 18th Street gang—a case also before Your Honor—even though the facts presented a far more egregious form of obstruction. In *United States v. Yanki Misael Cruz-Mateo*, No. 18-CR-139 (S-7) (LDH), defendants buried the victim's body in a five-foot grave, making discovery and prosecution of the murder significantly more difficult, and recorded a video of the gruesome killing to deter cooperation with law enforcement. These are textbook examples of obstructive conduct: concealing physical evidence central to the offense and threatening potential witnesses. Yet despite these facts, the obstruction enhancement was not imposed. The government cannot credibly argue that the destruction of a phone in Oscar's case—without any evidence that Oscar personally directed it—warrants harsher treatment. Accordingly, because the government cannot meet its burden to show that Oscar *personally and willfully* took steps to obstruct justice, and because destruction of the phone itself is insufficient, the two-level enhancement is unwarranted.

## II. A Sentence of 30 Years Reflects the Gravity of the Offense

The Guidelines for sentencing are merely a "starting point," *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010), and "truly advisory," *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). Under 18 U.S.C. § 3553(a)(1), courts must "carefully consider on an individualized basis 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *United States v. Jenkins*, 854 F.3d 181, 190 (2d Cir. 2017). Importantly, courts "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6). Finally, courts must "impose a sentence sufficient, but not greater than necessary, to comply with the factors set out in 18 U.S.C. § 3553(a)(2)," in other words, "proportionality, deterrence, incapacitation, and rehabilitation." *Douglas*, 713 F.3d at 700. The Court should impart the lowest possible sentence that takes into account the factors set forth in that section. *See United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) ("if a district court were explicitly

to conclude that two sentences equally served the purposes of § 3553, it could not, consistent with the parsimony clause, impose the higher").

### A. The Section 3553(a)(1) Factors Strongly Support a Sentence No Greater Than 30 Years

#### *1. The Nature of the Offense, While Grave, Was Shaped by Immaturity and Group Dynamics*

The nature and circumstances of the offense, while undeniably serious, were profoundly influenced by Oscar's youth and his susceptibility to negative peer influences. At the time of the murder, Oscar was just two months past his 18th birthday. His two co-defendants were even younger: 17 and 16. The government's attempt to frame Oscar as a mature adult who recruited and preyed upon minors is a mischaracterization. Gov't Letter at 15. He was himself a youth, operating within a peer group where no one possessed the judgment, impulse control, or moral compass of a fully developed adult.

Contrary to the government's portrayal, Oscar was not the singular "driving force" behind this offense. Gov't Letter at 1, 15. Rather, the evidence shows that the plan to murder Mr. Peralta was developed collectively among the group, with Mr. Amaya-Ramirez—an associate of the Indios Locos Salvatruchas clique—playing a key role in orchestrating the crime. PSR ¶¶ 16, 20. ███████████████████████████████████████████████████████████████████████████████████████ The plan to murder Mr. Peralta was developed among the group, with Mr. Amaya-Ramirez finding the proposed location in Kissena Park and using his girlfriend, Ms. Carranza, as the lure. *Id.* ¶¶ 20-21.

Perhaps most tragic is the senseless motive for the killing itself: a years-old social media video in which Mr. Peralta, who had ceased any affiliation with the 18th Street gang, briefly flashed a rival gang sign. *Id.* ¶ 19; Gov't Letter at 5. The PSR makes clear that at the time of his murder, Mr. Peralta was no longer an active gang member. PSR, ¶ 23. He himself told the defendants that while he had previously been involved, he had left that life behind. Yet in the distorted logic of adolescent gang culture, even this slight and distant association was treated as a capital offense.

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

██████ ████████████████████████████████████
█████████████████████████████

Oscar's history and characteristics provide important context for the Court's sentencing determination. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See* Exhibit A, Castillo, Y. and Cusicanqui, R., Pre-Sentence Memorandum for Oscar Flores-Mejia (August 2, 2025)[2].

Oscar was born in San Juan Opico, El Salvador, the youngest of nine children in a poor, but close-knit family. *See* PSR ¶ 95. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

In a desperate attempt to save him from this environment, his parents made the difficult decision to send him, at age 16, on the perilous journey to the United States alone. PSR ¶ 99. After being detained in a border camp for two months, he was released to his sister in New York. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[2] All exhibits referenced or attached to this letter are incorporated herein by reference.

[33] Additional letters from Oscar's other siblings are also included in Exhibit C.

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████.

**B.     The Section 3553(a)(2) Factors Support the Requested Sentence**

The Section 3553(a)(2) factors—the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with needed treatment—all support a sentence of 30 years.

First, a 30-year term unequivocally reflects the seriousness of this offense. It is a harsh and weighty penalty, effectively requiring Oscar to spend his entire adulthood in prison. For a young man barely past his 18th birthday, three decades behind bars is an extraordinary deprivation of liberty. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

Second, this sentence promotes respect for the law by imposing certain and severe consequences for gang violence. It sends an unmistakable message to Oscar, his associates, and the community: taking a life will lead to a life-altering loss of freedom. Importantly, empirical research shows that the certainty of punishment, not its extremity, is what matters most for deterrence. *See* Nagin, D., "Deterrence," in Reforming Criminal Justice: Punishment, Incarceration, and Release (Acad. for Just., Ariz. St. Univ. 2017). A 30-year term achieves that certainty. It also serves the goal of specific deterrence. ████████
███████████████████████████████████████
███████████████████████████████████████
██████

████ There is no reason to believe he remains at risk of reoffending after a 30-year custodial term.[4] As the United States Sentencing Commission itself acknowledges, individuals who

---

[4] The record does not support the government's claim that Oscar will "remain a danger to society for the rest of his life." Gov't Ltr. At 15. That prediction is speculative, extreme, and at odds with both the empirical literature and this defendant's profile. Oscar has no prior convictions, no history of violence beyond the instant offense, and significant mitigating

commit serious crimes as adolescents or young adults—especially in gang contexts—pose dramatically reduced risks of recidivism as they age into their 40s and beyond. *See U.S. Sentencing Comm'n, The Effects of Aging on Recidivism Among Federal Offenders* 1, 10-11 (2022) (showing that recidivism rates for offenders who committed their first offense before age 21 are significantly lower than for older offenders, and that recidivism declines sharply with age for all groups).

Third, three decades in prison is more than sufficient to provide just punishment and protect the public. It ensures that Oscar will not return to society until he is well into middle age, long past the point when most individuals age out of crime. *See id.* With three decades of incarceration, Oscar will have ample time to mature, reflect, and transform himself.

Fourth, a 30-year sentence provides a meaningful opportunity for Oscar to receive needed educational, vocational, and therapeutic services in prison. He will have access to the sorts of rehabilitative programming—mental health treatment, job training, and education—that will be essential for his development and eventual reintegration as a contributing member of society.

Finally, while the need for retribution is undeniable, it is not boundless. The Supreme Court has repeatedly emphasized that children are categorically different from adults for purposes of sentencing, and that juvenile offenders—particularly those whose crimes reflect transient immaturity—bear diminished culpability and heightened capacity for change. *See Miller v. Alabama*, 567 U.S. 460, 471 (2012). Although Oscar was legally an adult, he stood just on the cusp of adulthood, and his conduct bore the unmistakable hallmarks of adolescent impulsivity and peer pressure. A 30-year sentence is a profound and proportionate punishment—one that fully reflects the gravity of the offense without abandoning the core principle that youth remain capable of redemption.

### C.  A 50-Year Sentence Would Create, Not Prevent, Unwarranted Sentencing Disparities

Section 3553(a)(6) directs this Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The government's request for a sentence of at least 50 years would create—not eliminate—such disparity. It would mark a sharp and unjustified departure from sentences imposed in this very district on defendants who committed comparable or more aggravated MS-13 homicides, often under less mitigating circumstances. The 30-year sentence we request falls well within the heartland of sentences imposed by courts in this district, as reflected in numerous cases imposing terms of 30 years or less. *See* 10-cr-00074-JFB-5 (sentencing defendant Yonis Acosta-Yanes to 20 years for one murder and one attempted murder); 10-cr-00074-JFB-19 (sentencing defendant Mario Herrera-Umanzor to 22 years for one murder and

---

personal characteristics. ██████████████████████████████
████

one attempted murder); 10-cr-00074-JFB-25 (sentencing defendant Yobany Calderone to 21.8 years for the murder of a 16-year-old).

A comparison to defendants convicted in *United States v. Amaya-Sanchez*, 16-CR-403 (GRB), is particularly instructive. In that case, Jhonny Contreras, a defendant with a Criminal History Category of IV, was convicted for his role in three separate murders. Two of his victims were innocent men targeted and killed simply because of the color of their skin. His third victim was beaten with baseball bats and stabbed, and when that failed to kill him, a co-defendant cut his throat. Despite this history of racially motivated violence and multiple homicides, Mr. Contreras was sentenced to 35 years' imprisonment (420 months).

Similarly, Reynaldo Lopez-Alvarado, another defendant in *Amaya-Sanchez*, was convicted of participating in one murder, one attempted murder, obstruction of justice, and narcotics trafficking. He had a prior criminal record, placing him in Criminal History Category II. It was Mr. Lopez-Alvarado who personally took a knife and cut the throat of the third victim mentioned above to ensure his death. For this conduct, he received a sentence of 32 years' imprisonment (384 months).

The case of Alexis Hernandez in *Amaya-Sanchez* is also telling. 16-CR-403 (GRB)-17. Mr. Hernandez was convicted for his role in the massacre of four people, who were lured to a secluded park and attacked with machetes, knives, and an axe. Although he received a minor role adjustment, his conduct was part of a crime of almost unimaginable horror. He was sentenced to 27 years' imprisonment (348 months).

Sentences from *United States v. Amador-Rios*, 18-CR-398 (RPK), further confirm this pattern. In that case, Josue Leiva and Luis Rivas murdered a 16-year-old fellow gang member to advance their own rank. They lured the victim into a park and stabbed him over 20 times, nearly decapitating him. Both defendants had prior criminal records (Criminal History Category of II and III, respectively) and had committed separate, violent armed robberies. Pursuant to Rule 11(c)(1)(C) plea agreements, both were sentenced to 35 years' imprisonment (420 months).

These defendants—responsible for multiple homicides, with extensive criminal histories, and in some cases, leadership roles and acts of extreme personal brutality—all received sentences between 27 and 35 years. In stark contrast stands Oscar Flores-Mejia: an 18-year-old at the time of the offense, with a Criminal History Category of I and no prior convictions, who participated as a follower in a single, albeit horrific, murder. To sentence him to 50 years would be to punish him more severely than men who massacred four people, who killed multiple victims in separate incidents, and who personally slit the throats of their victims. Such an outcome would be fundamentally at odds with the principle of treating like cases alike and would create precisely the kind of unwarranted disparity § 3553(a)(6) was enacted to prevent.

Finally, the Court should reject the government's argument that a harsher sentencing is warranted due to the ages of Carranza and Lazo-Villa, 17 and 16 respectively. Gov't Ltr.

At 16. At the time of the murder, Oscar was only two months past his 18th birthday. Carranza and Lazo-Villa were Oscar's peers from high school. This is not a case in which an adult lures random minors to commit a crime with him – in such a circumstance a harsher punishment is certainly warranted. While Oscar received an additional two points for use of a minor, that is based strictly on age. But the court should not consider the circumstances of this case and recognize that Oscar did not lure minors; instead, these were contemporaries who together committed this crime.

### D. A 30-Year Sentence Satisfies the Core Aims of Sentencing: Proportionality, Deterrence, and Rehabilitation

18 U.S.C. § 3553(a) does not mandate retribution for its own sake. It instructs courts to impose a sentence "sufficient, but not greater than necessary" to achieve four defined goals: just punishment, deterrence, incapacitation, and rehabilitation. Each of these purposes must be evaluated not in the abstract, but in light of the specific facts and circumstances of the case and the individual being sentenced. A 30-year sentence strikes that balance. A sentence materially longer would not meaningfully advance any of these aims—and, in fact, would subvert them.

Just punishment requires proportionality. As the Supreme Court has repeatedly emphasized, a sentence must reflect both the seriousness of the offense and the personal culpability of the offender. *See Miller*, 567 U.S. at 475 ("[J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must courts consider … his background and mental and emotional development."). Oscar's conduct was undeniably grave. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ To sentence such a person to 50 years' imprisonment—effectively, to extinguish his future—would be disproportionate in the extreme.

Deterrence does not demand a longer term. General deterrence depends far more on the certainty of punishment than its duration. A 30-year sentence sends an unequivocal message to those who might consider gang violence: there will be devastating consequences. Nagin, D., "Deterrence," in Reforming Criminal Justice: Punishment, Incarceration, and Release, at *53 (Acad. for Just., Ariz. St. Univ. 2017)(finding that [l]enghty prison sentences cannot be justified on the basis of crimes prevented by deterrence . . ."). Nothing in the record suggests that a 50-year sentence would deter more effectively than 30 years.

Moreover, specific deterrence has already been achieved. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ The weight of his sentence—the loss of virtually all of his young adulthood and middle age—is sufficient to ensure that he poses no realistic threat to the public. By the time he is eligible for release, he will be in his mid-50s—well past the age of highest recidivism risk. *See* U.S. Sentencing

Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* (2022). At that point, he will be deported to El Salvador.

      Finally, rehabilitation must remain a meaningful sentencing goal. The Supreme Court has emphasized that youth is a period of "transient immaturity" and that even those who commit serious crimes as adolescents are not irredeemable. *Roper v. Simmons*, 543 U.S. 551, 570 (2005). Oscar is not beyond repair. By imposing a sentence that allows for the possibility of release while still exacting an immense cost, the Court affirms a basic premise of our justice system: that punishment can coexist with the possibility of transformation.

## Conclusion

      For the foregoing reasons, we respectfully request that the Court impose a sentence of 30 years' imprisonment.

Respectfully submitted,

*/s/ Celia A. Cohen*

Celia Cohen, Esq.

cc:    Jonathan Siegel, Assistant United States Attorney
       Michelle B. Malko, U.S. Probation Officer